**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 11-cv-02857-RM-KLM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

LAVERNE ST. CLAIR,

     Defendant.

_____

**AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

_____

This land dispute arises from events which occurred more than 100 years ago.   On August 1, 1876, Colorado entered the Union and became the Centennial State.   The Plaintiff, United States of America ("United States"), promptly hired John Fahringer ("Fahringer"), a surveyor, to perform a survey of public lands in southwest Colorado in order to create townships and sections, *i.e.,* establish formal designations of land to be used with respect to land descriptions and transactions.   Fahringer submitted field notes from his survey to the United States.   A plat was prepared and approved, depicting townships and sections as described by the Fahringer survey. Thereafter, by means of patents, the United States transferred land to settlers by descriptions referencing such plat, including an 1881 conveyance to Walter Overocker ("Overocker").   And, all would be fine if Fahringer had indeed done what he was retained to do.   But that was not so, as the parties agree, for some portions of Fahringer's township and section lines were hardly the product of actual field work; rather, they were extrapolations, projections, or sheer fiction unsupported by any trace of work having been performed on the ground.

Now, more than 100 years later, the United States finds that Fahringer's survey has led to a dispute with Defendant LaVerne St. Clair ("St. Clair"), one of Overocker's successors, as to the ownership of a certain 7.856 acres of land (the "Disputed Property") which is a portion of a larger tract of land that the United States some years ago denominated as "Lot 6" in Section 33, Township 36 North, Range 9 West of the New Mexico Principal Meridian.   The United States invoked this Court's subject matter jurisdiction, pursuant to 28 U.S.C. § 1345, to resolve the dispute requiring the Court to address the following question: Did the United States transfer the Disputed Property, which it now considers to be a part of the San Juan National Forest, to Overocker or a successor in 1881 or thereafter?

In order to resolve this question, a trial to the bench was held March 31 to April 4, 2014. During this time, the parties presented lay and opinion testimony, written evidence, and demonstrative exhibits for the Court's consideration.   Each party presented a number of arguments and theories as to why the evidence supports his or its position.   The United States' position is that the land conveyed to Overocker was fixed as of the date of patent issuance, that it was determined by reference to the Fahringer plat (notwithstanding its shortcomings), that it did not include the Disputed Property, and that the boundaries of the land conveyed did not change as a result of subsequent surveys necessitated by errors in Fahringer's work.   St. Clair's position is that the patent described land which the United States conveyed by aliquot (fractional) description (S½ NE¼ and N½ SE¼ of Section 33, Twp 36 N, R 9 W) and that this description had no meaning and could not be located on the ground until post-Fahringer township and section lines were established.   Because of the false if not fraudulent nature of aspects of Fahringer's survey, St. Clair contends that the relevant borders of his property (as an Overocker successor) had no meaningful existence until a later survey performed by Deputy Surveyor John Storm (the "Storm

Survey") in 1888.   The Storm Survey, along with some earlier work by others, shifted to the west seemingly fictitious Fahringer corners and quarter-corners along the southern boundary of Township 36 and Section 33.   As a result, St. Clair contends section lines controlling the patent came to be located differently than as determined by the Fahringer survey; and the boundaries of that parcel of land referenced in the patent first became established at this time.   St. Clair further contends that, due to this westward pivoting of Section 33's centerline, the aliquot description of land patented to Overocker came to encompass more land – *i.e.*, the Disputed Property – than it would have had if the original Fahringer survey had been reliable.   After careful consideration of the arguments and examination of the evidence, and the applicable law, the Court finds that Overocker never laid claim to the disputed 7.586 acres, and those acres were not transferred to him or a successor as part of the Overocker patent - either in 1881 or thereafter.   Accordingly, as set forth below, the United States owns the Disputed Property and is entitled to judgment in its favor on its claims for ejectment and trespass.

## I.   THE PUBLIC LAND SURVEY SYSTEM

The United States Public Land Survey System ("PLSS"), sometimes referred to as the "rectangular" survey system, is a method for describing, dividing, and transferring parcels of public land.

> The object of the [PLSS] is to create a checkerboard of identical squares covering a given area. The largest squares measure 24 miles on each side and are called "quadrangles."   Each quadrangle is further divided into 16 squares called "townships," the boundaries of which measure six miles and run north-south and east-west.   Each township is then divided into 36 one mile square "sections." Sections can then be further subdivided into quarter sections, quarter-quarter sections or smaller aliquot fractions.

Alan C. Morganfield & Charles Carpenter, *The Ins and Outs (and Zigs and Zags) of Legal*

*Descriptions*, 102A Rocky Mtn. Min. L. Spec. Inst. 11, pages 5-6 (1998).[1]

Generally PLSS surveys begin at an initial point, and townships are surveyed north, south, east, and west from that point.   The north-south line runs through the initial point and is called the Principal Meridian.   *See* R.S. § 2395 (1878).[2]   There are many different Principal Meridians. The east-west line that runs through the initial point is called a base line.   The base line is perpendicular to the Principal Meridian.   *See* Morganfield & Carpenter, at 6.   Each township is identified with a township and range designation.   *See id.* at 7.   Township designations indicate the location north or south of the baseline, and range designations indicate the location east or west of the Principal Meridian.   Section 1 is in the northeast corner of a township and other sections are numbered in a serpentine fashion (left to right on row 1, right to left on row 2, etc.).   R.S. § 2395 (1878).   Under this grid system, land may be identified by the pertinent Section, Township, and Range numbers.   And a parcel of land within a section may be described in at least two ways: (i) by metes and bounds descriptions – describing the outer boundaries of the parcel beginning at a set point and continuing around the parcel using directions and distances back to the starting point, or (ii) by reference to a fractional description of a section.   The latter is called an aliquot, *i.e.*, fractional, description.

## II.   FINDINGS OF FACT

1.   On September 1, 1876, just after Colorado joined the Union as the thirty-eighth state, Overocker executed a "Declaratory Notice" that he was asserting a claim to certain land in the Animas Valley in Colorado.   The Declaratory Notice was witnessed by J.P. Lamb,

---

[1.] Citation to Morganfield & Carpenter is made only to provide general information concerning the PLSS.
[2.] Passed at the Session of the Forty-Third Congress 1873-74.

Overocker's neighbor to the north, acknowledged and notarized on September 16, 1876, and filed in the local land office in Colorado on September 21, 1876.

2.      Overocker described his land (the "Overocker Land") as follows:

> Commencing for the North West corner at a stake placed beside a rock at the South West corner of the ranch claimed and occupied by J.P. Lamb and ... thence running from said stake one hundred and sixty rods east.   Thence one hundred and sixty rods south.   Thence one hundred and sixty rods west. Thence one hundred and sixty rods north to place of beginning....

3.      On October 4, 1876, the United States contracted with Fahringer to survey various lands in the new State of Colorado, including lands which came to be described as Township 36 North, Range 9 West of the New Mexico Principal Meridian ("Township 36") and Township 35 ("Township 35"), which lies directly to the south of Township 36.   Fahringer conducted his survey of Township 36 between January 10 and 19, 1877.   The Overocker Land was within Township 36.

4.      Based on Fahringer's survey field notes, a plat of Township 36 was prepared by a cartographer and subsequently approved by United States Surveyor General of Colorado, William L. Campbell, on April 24, 1877.   As such, it became the "Official Plat" of Township 36.   This official plat (sometimes referred to as the "Fahringer plat") depicts Township 36 as containing 36 square sections.   Overocker's house, but not the boundaries of his claim, was clearly depicted on the plat in Section 33 of Township 36.   (*See* Attachment 1 (part of Defendant's Trial Exhibit D).)

5.      The formal process for obtaining a patent from the United States required the applicant to follow several steps.   As relevant to this case, the applicant was required to identify a parcel of land, tender the cash value ($1.25 per acre) to the General Land Office ("GLO"), obtain a

receipt for the cash payment, obtain the issuance of a final certificate entitling the applicant to a patent on the identified land, and await the performance of due diligence by the Land Office. After such steps, the United States would issue a patent to the applicant.

6.      On March 20, 1880, Overocker commenced the formal process of securing a cash entry patent for the land subject to his 1876 Notice.   Overocker paid two-hundred dollars for 160 acres and received Receipt No. 43 at the Receiver's Office at the Lake City Colorado Land Office for the "S½ NE¼ and N½ SE¼" of Section 33 of Township 36.   On the same date, a final certificate issued for the Overocker Land.

7.      The land described in the cash entry of 1880 was the same land as that covered by the Declaratory Notice of 1876.

8.      The official file of the Lake City Land Office for Cash Entry No. 43 (Overocker's) states the following on its cover or first page:

>   S½ NE¼ + N½ SE¼ Walter H. Overocker D.S. 705 - Sept. 1, 1876
>   + May 14, 1877 - (illegible) ~~Conflicts as to~~ No Conflict W.G.O.
>   May 4, 1880 ….

This statement not only confirms that the lands covered by the 1876 Notice and that sought to be patented by Overocker in 1880 were the same, but also suggests that Overocker reasserted his claim after the April 24, 1877, approval of the Fahringer plat.

9.      On October 19, 1881, the United States, by President Chester Arthur, issued a cash entry patent (the "Overocker Patent") to Overocker for the Overocker Land, describing the conveyed land as that 160 acre parcel consisting of:

>   the south half of the north-east quarter and the north half of the
>   south-east quarter of section thirty-three, in township thirty-six
>   north, of range nine west of New Mexico Meridian, in Colorado,
>   containing one hundred and sixty acres, according to the Official
>   Plat of the Survey of the said Lands, returned to the General Land

Office by the Surveyor General, which said Tract has been
purchased by the said Walter H. Overocker.

10.     The "Official Plat" – the only plat ever governing Section 33 of Township 36

("Section 33") from 1880 to 1881 – was the Fahringer plat referenced above.   According to that

plat, the western boundary of the Overocker Patent was the north-south centerline of Section 33 as

laid out by Fahringer.   This centerline ran essentially due north-south.   (*See* Attachment 1.)

11.     As noted, the Overocker Patent was situated in Section 33 of Township 36.   The

southern boundary of Section 33 is part of the common boundary between Townships 36 and 35,

*i.e.*, the southern boundary of Township 36 forms the northern boundary of Township 35.

12.     A surveyor of public lands will leave evidence on the ground as to the location of

each of the four corners of a section, as well as to the location of a mid-point or "quarter-corner"

between section corners.   For example, a surveyor would establish on the ground a monument to

identify and mark the location of the NE corner, the N quarter-corner (N¼), and NW corner along

the northern border of a section and similar monuments for other corners around the remainder of

a section perimeter.   In the 1800s, the monuments used to mark the location of a corner or

quarter-corner were typically stones marked by the surveyor, wooden sticks or posts, or pits dug by

the surveyor.   These corner monuments could be used on the ground to locate the perimeter of a

section.   Additionally, theoretical lines formed by connection of the north and south

quarter-corners as well as the east and west quarter-corners establish north-south and east-west

centerlines for a section.

13.     Surveyors used "chains" to measure township and section boundaries.   A

surveyor's chain is a unit of measure equal to 66 feet in length.   A perfect section is 80 chains in

length and width and contains 640 acres.[3]   An alternative measure is a "rod."   A rod is one-fourth

of a chain.   Thus, a section's length or width may also be said to be typically 320 rods.

14.     Sometime after the Fahringer survey was completed, and the Fahringer plat

approved, and after the issuance of the Overocker Patent, the GLO determined that there were

egregious errors in portions of Fahringer's surveys of Southern Colorado.   This conclusion was

reached following numerous complaints from settlers that they could not locate various corners

purportedly established by Fahringer during his field work.   Among other areas, this was true

with respect to land in the northern tier of sections of Township 35 whose northern border was also

the southern border of Township 36.

15.     As a result of the settler complaints referenced above, the GLO dispatched deputy

surveyors to investigate.   In approximately July 1882, Deputy Surveyor F.W. Gove ("Gove")

found a multitude of errors in the areas generating settler complaints.   In approximately

November 1882, Deputy Surveyor William Clark ("Clark") was tasked with further examining the

problems in Townships 35 and 36.

16.     Clark was able to find a number of corner monuments set by Fahringer in Township

36, but he could not find them all.   Along the common southern boundary of Township 36 and

northern boundary of Township 35, Clark was unable to find evidence of any Fahringer corner

ever having been monumented on the ground.   And so, Clark set that boundary and monumented

new corners.

17.     In setting the Southwest corner of Township 36 (Northwest corner of Township

35), Clark was aided by the fact that he had found every corner set by Fahringer along the western

---

[3.] The formula used to determine acres is (chains x chains)/10; here, 80 chains x 80 chains = 6,400 chains/10 = 640
    acres.

boundary of Township 36 except one – the Southwest corner.   Nonetheless, he was able to follow the bearings of the western Township boundary and project along the line formed by the existing monuments.   Six miles south of the NW corner of the Township, he set the SW corner.   After setting the SW corner of Township 36 in this manner, and also finding or establishing the SE corner of the Township, Clark set the remainder of the southern boundary.

18.   Clark did not reestablish Fahringer corners along the southern boundary of Township 36, *i.e.*, recreate Fahringer's survey.   Instead, as it pertains to the shared border between Township 35 and Township 36, Clark conducted an original survey.   He established a new line, set monuments, and established section corners and quarter-corners.

19.   Clark's boundary did not, however, solve the problem which concerned the GLO. The boundary set by Clark was some 850 feet north of the boundary "set" by Fahringer. Additionally, the section corners and quarter-corners along the common border of Townships 35 and 36 now tended to be some distance west of the purported Fahringer section corners and quarter-corners.   (Clarks' three corners for Section 33 are shown as black diamonds on Attachment 2 (Plaintiff's Trial Exhibit 1, page 4).)

20.   Although the Clark survey was approved in 1882, no new plat of Township 36 was created based thereon.

21.   Thereafter, the GLO suspended settler entries in Township 36.

22.   In late 1887, Deputy Surveyor John A. Storm ("Storm") was directed by the Surveyor General for Colorado, according to the special instructions of November 14, 1887, to perform:

> the examination, retracement, establishment and connecting of lines
> in Tp 36 N.R.9W. and in the Northern tier of sections in Tp 35 N.
> R.9W. of the New Mexican Prince. Mer.

9

23.     To facilitate his work, Storm was provided with the plats and/or survey notes of those who had previously performed survey work in Township 36 and in the northern tier of Township 35, including the Fahringer field notes and plat and the Clark survey.

24.     According to the Storm special instructions, previously "acquired rights must be respected."   Storm was further tasked with gathering sufficient information "for constructing a plat which shows the extent of existing claims and for calculating the amount of acres in lots bordering such claims."   In other words, Storm was tasked with gathering as much data as possible, so the United States could construct a plat showing public and private land, describing public land by lots where necessary.

25.     Storm was able to find monuments, and thus corners, set by Fahringer at several locations in Township 36 – many along the north-south Township centerline (which centerline includes the western boundary of Section 33) – including the east quarter-corner for Section 28 (just north of Section 33).   However, with respect to Section 33, Storm could only find a single Fahringer corner - the east quarter-corner along that north-south Township centerline.   No evidence of any other corners in Section 33 could be found, and the parties agree that it is unlikely that any others were ever monumented.

26.     Storm performed his field survey of Township 36 in May and June of 1888.

27.     A new plat of Township 36, based on Storm's field notes, was prepared by a cartographer and subsequently approved by then United States Surveyor General of Colorado Oney Carstarphen on August 23, 1888.

28.     In terms of Section 33, the Storm survey and the corresponding plat accepted and used the Clark corners and quarter-corners along the southern boundary of the section.   The

10

survey and plat also used the Fahringer east quarter-corner of Section 33.   The NE, N¼ and NW

corners were set by Storm approximately where shown on the original Fahringer plat.

Additionally, a new west quarter-corner was, by necessity, set by Storm.

29.      As a result of the Storm survey and corresponding plat, the shape of Section 33 was

altered and no longer a true square running along essentially cardinal coordinates as called for by

the Fahringer survey and as shown on the Fahringer plat.   Instead, as compared to the Fahringer

plat, the southern boundary of Section 33 was further north, and corners on that southern boundary

were shifted to the west.   (*See* Attachment 2.)

30.      The cartographer who prepared the plat based on the Storm survey placed lot

numbers on federal lands in Section 33.   Two of these lots were "lot I" and "lot VI" (or lot 1 and

lot 6) which together formed a triangular wedge (lot I on top and lot VI on the bottom) formed by

the pivoting of the north-south centerline to the west.   (*See* Attachment 3 (part of Defendant's

Trial Exhibit M).)   This wedge of land had the Storm north-south centerline of Section 33 as its

western border and various private claims, including the Overocker Patent and land belonging to

J.P. Lamb and W.H. Lambert, as its eastern border.

31.      As depicted on the Storm plat, the Overocker Patent continued to comprise a

one-half mile square plot of land running along essentially cardinal coordinates.   However, due to

the westward movement of corners along the southern boundary of Section 33, the Overocker

Patent no longer had the north-south centerline of Section 33 as its western boundary as it had on

the Fahringer plat.   Additionally, a small portion of the Overocker Patent now rested in Section 34

of the Township.   (*See* Attachment 3.)

32.      The first plat prepared on the basis of the Storm survey had to be amended.   On

September 5, 1891, the Commissioner of the Department of the Interior wrote to the U.S. Surveyor

General for Colorado calling his attention to perceived problems with land claims being filed with reference to the Storm plat.   The claims at issue were entries of a James D. Johnson ("Johnson") and Frederick Steiniger ("Steiniger").   According to the Commissioner, these claims were being described as "partly in conformity with the legal subdivisions as indicated on the <u>discarded</u> plat survey of 1877, by Jason S. Fahringer, and partly in conformity with the lottings as indicated on plat-survey of 1888, by John A. Storm...."   (Emphasis in original.)   The Commissioner noted that Johnson's claim description was conflicting "as the W½ NW¼ of Section 33 embraces Lot 3 of said section."   (Lot 3 was a triangular plot of land just inside the western boundary of Section 33 which paralleled that triangular plot (Lot 1) just inside of the new Storm centerline.)   A similar issue was raised with respect to a timber claim of Steiniger.   The Commissioner directed that the Storm plat be amended, and that the amended plat use lot numbers for both public land and private claims.

33.     An amended plat based on the Storm survey was prepared and approved by then United States Surveyor General of Colorado E.C. Humphrey in September 1891.   Three amended plat dates are revealed by the evidence.   The first is September 14, 1891.   A second containing hand drawn lot outlines is dated September 22, 1891.   A third is referenced as being approved on December 22, 1891.   There are no material differences in these plats regarding matters which pertain to the Overocker Patent.

34.     The amended Storm plat placed lot designations on all lands within Section 33. The land contained within the Overocker Patent was shown as being Lots 8 and 9 of Section 33 and Lot 2 of Section 34.   Lot 8 was the northern half of the Overocker Patent and Lot 9 (Section 33) together with Lot 2 (Section 34) comprised the southern half.   (*See* Attachment 3.)

35.     On February 2, 1893, the Assistant Commissioner for the Department of the

Interior, General Land Office, Washington, D.C., wrote to the Register and Receiver of the local land office in Durango, Colorado.   He directed the local authorities to approach parties who had acquired private interests in land prior to the Storm survey, and advise them of land description changes caused by the Storm plat.   The local authorities were instructed "that if he [the patentee] desires the entry amended so as to conform to the resurvey, he should surrender the patent together with a properly executed quit claim deed duly recorded, conveying the land patented to the United States."   An affidavit of no encumbrances was also required.   An amended or new patent would then issue using the updated land descriptions.

36.    By 1893, Overocker was no longer the owner of the land conveyed by the Overocker Patent.   He lost his interest in the Overocker Land when that land was made subject to an 1882 trust deed and subsequently foreclosed upon in 1884.   There is no evidence that any successor-in-interest to the Overocker Patent requested an amended entry or amended patent.

37.    Federal lands within Section 33 were made part of the San Juan National Forest in 1907.  This was done by Proclamation of President Theodore Roosevelt in March 1907.

38.    The Bureau of Land Management (BLM), successor to the GLO, commenced a dependent resurvey of Section 33 in 1979, found and accepted the monuments adopted or set by Storm, and issued a plat.   The current day plat and survey are consistent with the Storm plat and survey.

39.    St. Clair is a successor-in-interest to land in the southern half of the Overocker Patent.   He and his first wife originally acquired their property on May 23, 1967 from Angelo Dallabetta ("Dallabetta"), an earlier successor-in-interest.   The warranty deed described the acquired property as:

13

> A tract of land in Lot 9, Section 33, Township 36 North, Range 9
> West, N.M.P.M., described as follows: BEGINNING at a point on
> the North line of the RED ROCK SUBDIVISION, whence the
> Northeast Corner of said Subdivision bears N. 89°53' E., 284.10
> feet; Thence along the top of a prominent sand-stone ledge, N. 9°31'
> E., 101.43 feet; N. 5°00' E., 293.54 feet; N. 15°31' E., 134.56 feet;
> N. 4°02' E., 158.35 feet, and N. 6°56' W., 226.74 feet to the North
> line of said tract (being the South line of the Houser Tract); thence
> West along said North line 600 feet, more or less, to the West line of
> said Lot No. 9; thence Southerly along said West line 910 feet, more
> or less, to the North line of the Red Rock Subdivision.   Thence
> N.89°53' E, along said N. line 549 ft.+ to point of beginning.

This description does not include the Disputed Property which lies to the immediate west and

which has, since the late 1800s, been a part of Lot 6.

40.     On June 24, 1976, his first wife having previously quit claimed her interest in the

above-described property to him, St. Clair conveyed the property to himself and his second wife by

warranty deed utilizing the same legal description as set forth in ¶39 above.

41.     When Dallabetta obtained his interest in the land sold to St. Clair, it was by deed

containing a different legal description.   The 1951 Warranty Deed from James and Lois

Heidelberg to Dallabetta (and his then wife) described the land conveyed not by reference to Lot 9,

but instead by aliquot description tracing back to the original Overocker Patent (N½ SE¼, Section

33, Township 36).   In fact, all conveyance documents before Dallabetta, which were introduced

into evidence (which do not necessary include a complete chain of title), use this aliquot

description.

42.     St. Clair wanted to acquire some additional land unrelated to this ligation which

was also owned by Dallabetta.   St. Clair and Dallabetta were, however, unable to reach an

agreement as to a fair price for this additional land.   Some years later, in the 1980s and following

Dallabetta's death, St. Clair negotiated for the purchase of this additional property with the First

National Bank which represented Dallabetta's estate.   There was again disagreement as to a fair

price.   In the course of these negotiations, in order to "sweeten the deal," the bank agreed to

include a quit claim deed to the 7.856 acre parcel in Lot 6 which comprises the Disputed Property.

The transaction then closed.

      43.    The quit claim deed was made and given to St. Clair on May 25, 1984 and

described the tract of land conveyed as a "Disputed Area" further described as:

> A tract of land lying and being in the North Half of the Southeast
> Quarter of Section 33, Township 36 North, Range 9 West,
> N.N.P.M., County of La Plata, State of Colorado and is more
> particularly described as follows:
>
> BEGINNING AT A POINT from which the center of said Section
> 33 bears North 06°34'27" East a distance of 403.48 feet.
>
> > Thence South 06°34'27" West a distance of
> > 939.85 feet along the North-South
> > Centerline of said Section 33 to the
> > Centerline South 1/16 corner of said
> > Section 33.
> > Thence North 89°21'41" East a distance of
> > 416.20 feet along the South boundary
> > line of the North Half of the
> > Southeast Quarter of said Section 33
> > to the Southwest corner of Lot 9 of
> > said Section 33;
> > Thence North 00°36'02" East a distance of
> > 931.07 feet along the West boundary
> > line of said Lot 9;
> > Thence South 89°38'27" West a distance of
> > 318.34 feet to the North-South
> > centerline of said Section 33 and to
> > the POINT OF BEGINNING, and
> > containing 7.856 acres.

      44.    Conflict between the United States and St. Clair as to ownership of the Disputed

Property first came to light circa April 2000 when Forest Service personnel came across a road

15

being constructed by St. Clair and began investigating a possible disturbance of protected artifacts. As a result of its investigation, government personnel came to learn of the installation of fence posts, brush hogging, and vegetation clearance occurring on the north, west and southern borders of the Disputed Property.   The United States did not give St. Clair any permission to conduct such activities on the Disputed Property.

45.     The cost to remediate this damage/alteration of the Disputed Property is $4,634.88.

46.     The government introduced the expert testimony of Randy Bloom, Chief Cadastral Surveyor for Colorado at the BLM.   Mr. Bloom's opinion is that the Disputed Property is, and has always been, the property of the United States.   According to Mr. Bloom, the Disputed Property was never part of the Overocker Patent.   As such, according to Mr. Bloom, it was never owned by any successor-in-interest to Overocker.   While not specifically so stated, this includes Dallabetta.

47.     St. Clair introduced expert testimony of two licensed professional surveyors, Zane Wright and Donald Geddes.   The opinion of both Mr. Wright and Mr. Geddes is that the Disputed Property was part of the Overocker Patent, was conveyed over the years to various successors-in-interest, including Dallabetta, and is now owned by St. Clair.   These surveyors opine that the Fahringer survey was a work of fiction which could not be replicated on the ground in the relevant area.   Consequently, the aliquot description of the S½ NE¼ and N½ SE¼ – the Overocker Patent land description – had no discernable meaning until the Storm survey when the contours of Section 33 were monumented and, in their opinion, meaningfully established.   And, as the north-south centerline of Section 33 was determined by Storm to pivot west from the Fahringer centerline, the aliquot description in the Overocker Patent encompassed all land in the triangular wedge lying between the Storm centerline and the fictional Fahringer centerline. Indeed, in the opinion of these experts, the western boundary of the Overocker Patent was, and is,

the north-south centerline determined by Storm.

48.     The BLM maintains a historical index of land transactions for Township 36.   That index is a successor to local land office tract books which were kept in the 1800s and which had been maintained by the local land offices.   The only difference of note between the data in the two sets of records is that the old tract books showed the name of the land entrant, while the historical index does not.

49.     The historical index for Township 36 shows that a homestead entry was made on Lot 6 in Section 33 (which includes the Disputed Property) on May 6, 1890.   The homestead entry was cancelled on July 9, 1898, for failure to prove up the homestead.

50.     The historical index for Township 36 also shows that the United States issued an oil and gas permit covering both Lots 1 and 6 in Section 33 on July 11, 1925 and later cancelled the permit on December 9, 1929.   Another oil and gas lease covering these lots issued on July 1, 1964, was partially cancelled in 1967, and termed in 1968.   Yet another oil and gas lease covering these lots issued on October 4, 1977 and expired in September 1987.

51.     Nothing in the historical index or tract book contains any suggestion that the Disputed Property or any portion of Lots 1 or 6 were ever treated by the United States or others as part of the Overocker Patent.

52.     St. Clair has directed the Court to various land entries and transactions in Township 36 which he claims demonstrates that the United States treated the Fahringer survey and plat as utter nullities and considered all aliquot descriptions in Township 36 to be as governed only by the Storm survey.   This evidence, he argues, refutes any notion that the Fahringer plat (the only plat in existence before the Overocker Patent's issuance) continued to control aliquot descriptions once Fahringer's work was recognized as partially fictional and discarded.   The entries highlighted

17

were Bloom's and Bergstedt's in Sections 31 and 32, Johnson's and Steiniger's referenced in the Commissioner's letter of September 5, 1891, and Maggy Woodward's ("Woodward Patent") in Section 34 in 1893.

53.     None of these entries or transactions pertains to Lot 6 or the Disputed Property.

54.     As for the Bloom and Bergstedt entries, each is shown on the Storm survey plat with respect to a quarter-section of land – Bloom in the NE¼ of Section 31, and Bergstedt in the NW¼ of Section 32.   On the Storm plat, their property interests, unlike Overocker's, conform to the westward shift of corners along the southern border of the Township which resulted from Clark's work which was later adopted by Storm.   (*See* Attachment 3.)

55.     The evidence with respect to the significance of the Bloom and Bergstedt entries is less than comprehensive.   The historical index shows that both Bloom and Bergstedt made homestead entries.   Bloom acquired an interest by aliquot description on May 9, 1882, but his interest was cancelled on April 14, 1891.   Bloom's interest (as reflected on the index) was before Gove, Clark or Storm.   Bergstedt acquired an interest by aliquot description on May 9, 1883, but his interest was cancelled on November 18, 1891.   Bergstedt's interest (as reflected on the index) was post Gove and Clark, but pre-Storm.   It is true that, as shown on the Storm plat, both aliquot descriptions seem to conform to the westward pivot on the corners along the southern boundary of Township 36.   (*See* Attachment 3.)   But, the Court concludes that there was insufficient evidence presented to enable the Court to make firm determinations with respect to the Bloom and Bergstedt claims, much less to be able to transfer those determinations to the Disputed Property.   The claim documents themselves are not before the Court.   What Fahringer monuments were or were not found in the area of these claims is unknown.   Most importantly, neither of these properties is in the same section of Township 36 as the Disputed Property.

18

56.     As for the Johnson and Steiniger claims, the tract book shows that Johnson's entry occurred in 1890 and at least a portion of Steiniger's in 1889 – both after the Storm survey.   Thus, it appears that the Fahringer plat never governed the aliquot description of these claims because an approved and later survey – the Storm survey – was in place before the claims were made. Consequently, the criticism of the blending of Fahringer and Storm descriptions made in 1891 by the Commissioner of the Department of the Interior was correct and not indicative of the conclusion St. Clair would have the Court draw.

57.     The evidence which best supports St. Clair's position is the Woodward Patent. Ms. Woodward's homestead patent was issued on November 10, 1893.   It conveyed:

> the East half of the Northwest quarter and the North
> half of the Southwest quarter of section thirty-four in
> Township thirty-six North, of range nine West of
> New Mexico Meridian in Colorado ... according to
> the Official Plat of the Survey of the said Land,
> returned to the General Land Office by the Surveyor
> General:

58.     On November 10, 1893, the Official Plat was the Storm Plat.   And, according to the Storm Plat, the Overocker Patent included a small portion of land in Section 34 known as Lot 2. Lot 2 was situated within the N½ SW¼ of Section 34.   Thus, facially, it appears the United States would have patented the same land twice unless the borders of the Overocker Patent had been viewed as shifted in order to conform to section lines constructed by the Storm survey.   However, witnesses for the United States testified that the Woodward Patent was governed by the plat in existence at the time Ms. Woodward established her original homestead entry.   This testimony was unchallenged.   And testimony as well as documentary evidence (Plaintiff's Exhibit 21 at page 4) established that Ms. Woodward's entry was in 1880 or 1882, which was during the time of the Fahringer plat.   But the Court need not resolve a dispute as to issues on the eastern border of

the Overocker Patent as it does not directly pertain to the Disputed Property on the far western

border.   If an error did occur on the eastern border of the Overocker Patent, and the evidence

appears to the contrary, that would not dictate any specific interpretation of events on the western

border; it may simply be that Woodward's successors-in-interest would have a claim relating to

Lot 2.

59.     The Court has examined, in detail, the Fahringer and Storm field notes and

concludes that they are compatible with respect to the Overocker Land and consistent with the

shape of the Overocker Land as shown on the Storm Plat (that is, a 160-acre square parcel of land

whose borders run on cardinal coordinates).   Fahringer's notes, at page 383, show that he

purported to set the east quarter-corner of Section 33 by stone marker 40 chains south of the NE

corner of Section 33.   Fahringer's survey notes also show that the eastern border of Section 33 (as

well as the other boundaries of the Section) ran essentially along cardinal coordinates.   In short,

the eastern edge of the north half of the Overocker Land as described by the later issued Overocker

Patent would have been a perfect 20 chains in length running in a north-south direction.

60.     Storm's survey notes, at pages 523-24, show that Storm located the Fahringer east

quarter-corner twenty chains north of the point where the NE corner of the property of William H.

Lambert and the NW corner of the property of J.C. Turner meet in Section 34.   An examination of

the various plats and other records presented to the Court shows that this point was also the SE

corner of the Overocker Land.   In short, the eastern edge of the south half of the Overocker Patent

(from the SE corner of the Overocker Land to the midpoint of its eastern boundary – defined by the

Fahringer east quarter-corner) was also a perfect 20 chains in length.   And again, measurements

along this line ran essentially on north-south cardinal coordinates.

61.     The evidence at trial clearly demonstrates that the Overocker Land could be located

on the ground notwithstanding the fictitious nature of some of Fahringer's field work.   Overocker himself had done so.   One could simply start at the confirmed Fahringer east quarter-corner and go north 20 chains, then west 40 chains, then south 40 chains, then east 40 chains and then north 20 chains to establish the boundaries of a square parcel of land containing 160 acres.[4]   This parcel would be the equivalent of a "perfect" quarter section, as was the land covered by the Overocker Patent.   It would be consistent with the placement of the Overocker Patent on the Storm Plat as Lots 8 and 9 in Section 33 and Lot 2 in Section 34.   And most importantly, it would be wholly consistent with the original borders of Overocker's claim as laid out by Overocker himself in his Declaratory Notice of September of 1876 – a 40 chain by 40 chain[5] square plot due south of J.P. Lamb's land, containing 160 acres with boundaries generally tracking cardinal coordinates.

62.     Additionally, the Court finds that the Fahringer plat, flawed and troublesome though it may be, was the sole and controlling plat at the time of issuance of the Overocker Patent, and that the Fahringer plat governed the location of the Overocker Land.   Subsequent surveys which altered the boundaries of Section 33 neither established, expanded nor contracted the western border of Overocker Land or the Overocker Patent.   More specifically, the pivoting of the north-south centerline to the west along the southern boundary of Section 33 did not define or shift the western border of the Overocker Patent so as to include the Disputed Property.

63.     The United States is, and has continuously been, the owner of the Disputed Property.   Neither Overocker nor any successor-in-interest prior to St. Clair asserted ownership of the Disputed Property.

---

[4.]  The Court is aware that Mr. Bloom testified at trial in response to a hypothetical that it would be improper for a surveyor to locate the Overocker Patent on the ground simply by starting at the Fahringer east quarter-corner and proceeding to create a square in a manner similar to that described above.   But, here, the Court was been presented with more information that that provided to Mr. Bloom, including evidence that Overocker himself had set out the boundaries of his claim in an almost identical manner.

[5.]  There are 4 rods in a chain.   Thus, Overocker's measurements of 160 rods per side equates to 40 chains per side.

64.     St. Clair has never paid any taxes on the Disputed Property.

65.     St. Clair has wrongly asserted ownership of the Disputed Property, has entered thereon without permission of the United States, and has damaged the Disputed Property belonging to the United States.

66.     On the United States' First Claim for Relief for Ejectment, the Court finds in favor of the United States.   The Court more specifically finds that the United States is entitled to an order of ejectment and an order enjoining St. Clair from using or occupying the Disputed Property.

67.     On the United States' Second Claim for Relief for Trespass, the Court finds in favor of the United States.   The United States is entitled to actual damages in the amount of $4,634.88.

### III.   CONCLUSIONS OF LAW

#### A.     The Fahringer Survey and Resulting Plat Controls the Overocker Patent

The United States conveys title through a patent and, "once patent has issued, the rights of patentees are fixed and the government has no power to interfere with these rights …." *United States v. Reimann*, 504 F.2d 135, 138 (10th Cir. 1974) (citing *Cragin v. Powell*, 128 U.S. 691 (1888)).   "[T]he government is bound by the last official survey accepted prior to its divestment of title." *Reimann*, 504 F.2d at 139.   Accordingly, the last accepted survey is the controlling survey as to the location of the patent's boundaries. *Id.* at 140.   The aliquot parts of a patent must be determined in accordance with that survey, even where erroneous. *Id.* at 140.   That survey applies even if the survey and its location of boundaries are "fatally defective," "erroneous," or "largely fictitious." *Id.* at 139.

In this case, Fahringer was hired to conduct a survey of Township 36, including Section 33. Fahringer returned his field notes of his survey, which were used to create the Fahringer plat, the first plat of the Township.   The Fahringer plat was approved by the Surveyor General and became

the official plat of Township 36.   Overocker's cash entry was made, and the Overocker Patent was thereafter issued, in accordance with the "Official Plat," *i.e.*, the Fahringer Plat.   Accordingly, it is the Fahringer Plat, and the information supporting such plat, which determines and governs the location of the Overocker Land and the boundaries of the Overocker Patent.   As constrained by the Fahringer plat, the aliquot description used to describe the Overocker Patent does not include the Disputed Property, which continues to be owned by the United States.

St. Clair makes much of the fact that many of Fahringer's monuments could not be found on the ground.   Only one could be found in Section 33 and none could be found on the common boundary between Township 36 and Township 35.   Therefore, according to St. Clair, the Overocker Patent was not locatable on the ground.   This premise, however, ignores the rule that it is not just the monuments on the ground which control.   Instead,

> [i]t is a well-settled principle that when lands are granted according to an official plat of the survey of such lands, the plat itself, with all its notes, lines, descriptions, and land-marks, becomes as much a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself.

*Cragin v. Powell*, 128 U.S. 691, 696 (1888).   Thus, the Overocker Patent is governed not only by monuments on the ground, but also by the bearings, distances and other data of the Fahringer plat which was accepted and became the official plat four years before the Overocker Patent was issued.   *See Reimann*, 504 F.2d at 140.   And the plat was more than sufficient to determine the placement of the aliquot description of S½ NE¼ and N½ SE¼ Section 33 as laid out on the Fahringer plat.

### B.     The United States had authority to conduct surveys and resurveys, which protected rather than *defined* the Overocker Patent

The United States is entitled to conduct resurveys of the public land.   "[The United States]

23

is entitled to survey and resurvey what it owns[,] and to establish and reestablish boundaries, as well one boundary as another, the only limit being that what it thus does for its own information cannot affect the rights of owners on the other side of the line already existing in theory of law." *Lane v. Darlington*, 249 U.S. 331, 333 (1919); *see Koch v. United States*, 846 F. Supp. 913, 916 (D. Colo. 1994).

In this case, the United States was entitled to conduct surveys, resurveys, and retracements and did so.   The United States contracted with Clark who conducted what would today be described as an original survey of the southern boundary of Township 36, creating a new boundary line and setting new corner monuments for the Township line and Sections 31-36 running along this southern border.   The United States thereafter contracted with Storm who, after setting the Fahringer NE, N¼, and NW corners of Section 33 and accepting the Clark SE, S¼, and SW corners, created new section lines.   The Storm plat was thereafter created from Storm's survey and approved.   However, the Storm plat never altered the land conveyed by the Overocker Patent. Instead, as instructed and as required by law, Storm protected the Overocker Patent.   The Storm plat showed the land conveyed by the Overocker Patent in the very place where such land would and did lie under the Fahringer plat.   And the BLM dependent resurvey almost a century later did the same.

St. Clair argues that the Overocker Patent is determined – and therefore governed – not by the placement of the land covered by the Overocker Patent on the Storm plat, but instead by Storm plat's determination of the outer boundaries and centerline of Section 33.   This argument appears predicated on two propositions: (1) in the absence of monuments on the ground, the Overocker Patent was not previously locatable; and (2) because the Overocker Patent used aliquot or fractional descriptions for the property conveyed, the section boundaries necessarily dictate the

24

location of the fractional component of the Section.   As a matter of both the facts in this case and law, as explained above, the first proposition is incorrect.   The second is entirely correct, but only when considered in the context of the official plat in existence at the time of patent issuance. Here, that was the Fahringer plat, not Storm's.

St. Clair's argument, at its core, is rooted in logic.   But the logic employed collapses under the weight of the incredible determinations which would need to be made in order to support that logic.   The Fahringer plat would have to be ignored.   The Overocker Patent language referencing the "Official Plat" would have to be ignored.   The placement of the Overocker Land on the Storm plat would have to be ignored.   The land office language noting "no conflict" between Overocker's original 1876 claim (made before any section lines existed) and Overocker's 1880 cash entry patent application would have to be ignored.   The various land transactions occurring over decades after issuance of the Overocker Patent with respect to Lot 6 (which contains the Disputed Property) would have to be ignored.   And, the Overocker Land would now be placed where no plat over the last 140 years has ever situated it – and where Overocker himself had not placed it.   In the view of the Court, such an outcome would require replacing a Fahringer fiction with a St. Clair one.

Finally, at trial, St. Clair repeatedly claimed that the placement of lot numbers on the Overocker Land on Storm plats was improper.   The thrust of the argument was that the United States was attempting to change the description of the Overocker Land as part of a wrongful, or at least erroneous, effort to alter the prior conveyance of an aliquot to Overocker.   There was nothing wrong with the assignment of lot designations to the Overocker Land in the various Storm plats.   As recognized by the court in *Koch,* 846 F. Supp. at 917, all this does is change "the description of the property on paper" and not its boundaries "on the ground."   In Overocker's

case, once the Storm plat established a new perimeter for Section 33, it was no longer accurate to apply the original aliquot description of the Overocker Land to the Storm plat.   Instead, the use of lots to designate lands within Section 33 was sensible and practical.   Accordingly, the Court concludes that the United States, as long as it did not disturb that land which it had already conveyed, was legally entitled to conduct additional surveys or resurveys of the land surveyed by Fahringer, and to describe parcels of land (public and private) by lot numbers on its plats.   And, as the Court has found above, the United States did not change the boundaries of the Overocker Patent in doing so.

### C.  The United States did not accept or acknowledge the St. Clair interpretation by conduct undertaken after discovery of the Fahringer errors

Throughout the course of trial**,** St. Clair pointed to various statements and acts of the United States as indicative of its acceptance and acknowledgement of the correctness of St. Clair's position in this matter.   He has pointed to the fact that the Commissioner of the Department of the Interior referred to the Fahringer plat in 1891 as "<u>discarded</u>."   He has pointed out that in 1893, the government proposed approaching those who acquired land prior to the Storm survey and presenting them with an opportunity to acquire new or amended patents.   He has directed the Court to depictions on the Storm plat (Bloom and Bergstedt) which suggest that the government intended to conform prior land transactions to the Storm survey.   And he has directed the Court to the Woodward Patent.   None of this is convincing.

First, the Court views the various statements about Fahringer and the offer to issue new or amended plats which would conform in their legal description to the Storm plat as simply recognition of the obvious and attempts to address the same.   There were egregious errors in the Fahringer survey.   Once the extent of the difficulties became clear, the United States stopped

using the Fahringer plat as a basis for land transactions, suspended settlements, and had subsequent surveys conducted.   Recognizing the potential for confusion with respect to aliquot descriptions used with reference to the Fahringer plat after acceptance of a new plat which placed section lines in different locations, the United States sought to reduce potential confusion by offering the opportunity for amended plats which changed the description, not the location, of previously conveyed land so as to conform to the new plat.   Nothing in these expressions or actions is viewed by the Court as some form of conveyance or adjustment of previously conveyed property on the ground.   Nor is it viewed as an acknowledgement that some form of determination or adjustment on the ground had been made.   In terms of Bloom, Bergstedt, and similar matters, including the Woodward Patent, the Court has determined that the evidence presented does not enable the Court to reach the conclusion St. Clair would have the Court reach.

Second, and more important than the factual interpretation of these matters, is the controlling law.   It would be improper to imply or acknowledge a land transfer under these facts and circumstances.   "'[L]and grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.'"   *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 59 (1983) (quoting *United States v. Union Pacific R. Co.*, 353 U.S. 112, 116 (1957)).   "In a public land grant[,] nothing passes by implication."   *Walton v. United States*, 415 F.2d 121, 123 (10th Cir. 1969).

Just as it did not convey the Disputed Property in the Overocker Patent, the United States did not in any way acknowledge or effectuate a transfer or surrender of the same by its conduct. The Disputed Property, as noted, remains the property of the United States.

### D.      Trespass

"[T]he United States can protect its lands against trespassers."   *United States v. Osterlund*,

27

505 F. Supp. 165, 167 (D. Colo. 1981), *aff'd*, 671 F.2d 1267 (10th Cir. 1982).  "The government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers.  It may deal with such lands precisely as a private individual may deal with his property."  *Id.*  In order to establish a claim for trespass, a plaintiff must show "physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property."  *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003).  The trespass may "occur when an actor intentionally enters land possessed by someone else, or when an actor causes something else to enter the land."  *Hoery*, 64 P.3d at 217.  To prove the defendant acted with the requisite intent to commit the trespass, the plaintiff need only show that the defendant acted with "'an intent to do the act that itself constitutes, or inevitably causes, the intrusion.'"  *Antolovich v. Brown Group Retail, Inc.*, 183 P.3d 582, 603 (Colo. App. 2007) (quoting *Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1067 (Colo. App. 1990)); *see also Hoery*, 64 P.3d at 217.

In this case, the United States owns the Disputed Property.  The evidence shows that St. Clair intentionally entered that property without the United States' permission.  Upon his entry onto the Disputed Property, again without the United States' permission, St. Clair intentionally "brush hogged" parts of the property, widened an area around the property, and installed fence posts along its outer perimeter.  The Court, therefore, concludes that St. Clair trespassed on the Disputed Property and the United States has been damaged.

### E.    Ejectment

An ejectment is a legal action for possession of property.  *See City of Cincinnati v. White's Lessee*, 31 U.S. 431, 441 (1832); *Sun Oil Co. v. Fleming*, 469 F.2d 211, 214 (10th Cir. 1972).  In order to maintain a possessory action, the plaintiff must have legal title to and the clear and present

right to the possession of the property, and the defendant must be a "wrong doer."  *White's Lessee*, 31 U.S. at 441-42.  That is, the defendant must hold the property adversely.  *Fleming*, 469 F.2d at 214.  Where the plaintiff prevails and judgment is entered in its favor, the delivery of possession of the property to the plaintiff must follow.  *White's Lessee*, 31 U.S. at 442.  In this case, the United States has legal title to, and the present right of possession of, the Disputed Property which St. Clair holds adversely.  Accordingly, judgment of ejectment should enter in favor of the United States.

### F.    Damages

In its Amended Complaint, the United States requests monetary damages and punitive damages.  The Court finds that the United States is legally entitled to monetary damages.  As a result of St. Clair's actions on the Disputed Property, such as brush hogging and placing fence posts around the perimeter, remediation of the property will be required.  The United States has sufficiently shown that an award of damages in the amount of $4,634.88 is appropriate.  The Court, however, does not find that an award of punitive damages is warranted in light of the evidence presented at trial.

### III.   CONCLUSION

In summary, the United States is the owner of the Disputed Property on which St. Clair has trespassed and in which St. Clair is in wrongful possession.  The United States has also sustained damages as a result of St. Clair's actions on the Disputed Property.  It is therefore

**ORDERED** that Plaintiff United States of America is the owner of and holds title to the Disputed Property, to wit:

A tract of land lying and being in the North Half of the Southeast Quarter of Section 33, Township 36 North, Range 9 West, N.N.P.M., County of La Plata, State of Colorado and is more particularly described as follows:

BEGINNING AT A POINT from which the center of said Section 33 bears North 06°34'27" East a distance of 403.48 feet.

> Thence South 06°34'27" West a distance of 939.85 feet along the North-South Centerline of said Section 33 to the Centerline South 1/16 corner of said Section 33.
> Thence North 89°21'41" East a distance of 416.20 feet along the South boundary line of the North Half of the Southeast Quarter of said Section 33 to the Southwest corner of Lot 9 of said Section 33;
> Thence North 00°36'02" East a distance of 931.07 feet along the West boundary line of said Lot 9;
> Thence South 89°38'27" West a distance of 318.34 feet to the North-South centerline of said Section 33 and to the POINT OF BEGINNING, and containing 7.856 acres.

That the Plaintiff United States' ownership has been continuous and the Disputed Property has never been transferred or otherwise conveyed under the Overocker Patent; it is

**FURTHER ORDERED** that Defendant Laverne St. Clair is liable to Plaintiff United States of America on its claims for trespass and ejectment; it is

**FURTHER ORDERED** that Plaintiff United States is awarded damages in the amount of $4,634.88; it is

**FURTHER ORDERED** that Defendant Laverne St. Clair shall remove all of his personal property from the Disputed Property without damaging such property, and shall relinquish

possession of the Disputed Property to Plaintiff United States, all within thirty days of the date of this Order; it is

      **FURTHER ORDERED** that Plaintiff United States is awarded costs and shall within 14 days of the date of this Order file a bill of costs, in accordance with the procedures under Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk of the Court; and it is

      **FURTHER ORDERED** that the Clerk of the Court is directed to enter final judgment in favor of Plaintiff United States of America and against Defendant Laverne St. Clair as set forth herein.

      DATED this 27th day of March, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge